IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Cynthia Hopper,                                    :
                                                   :        Case No. 1:18-cv-671
            Plaintiff/Counterclaim Defendant,      :
                                                   :        Judge Susan J. Dlott
                        v.                         :
                                                   :        Order Granting in Part and Denying in
Bernstein Allergy Group, Inc.,                     :        Part Motions for Summary Judgment
                                                   :
            Defendant/Counterclaimant.             :


        This matter is before the Court on the cross-Motions for Summary Judgment (Docs. 22,

31) filed by Defendant/Counterclaimant Bernstein Allergy Group, Inc. ("Bernstein Allergy") and

Plaintiff/Counterclaim Defendant Cynthia Hopper, respectively.  Hopper sued Bernstein Allergy,

her former employer, for disability discrimination after she was terminated from her job.

Bernstein Allergy denied that Hopper had a disability and denied that it discriminated against

her.  Bernstein Allergy also filed counterclaims against Hopper asserting that she wrongfully

disclosed and misappropriated confidential patient medical records.  Hopper denied wrongdoing

and liability on the counterclaims.

        For the reasons that follow, the Court will **GRANT IN PART** and **DENY IN PART** the

Motions for Summary Judgment.  The case will proceed to trial only on Hopper's disability

retaliation claim.

## I.     BACKGROUND

### A.     Factual History[1]

#### 1.     Hopper's Employment History and Medical Absences from Work

Hopper began employment with Bernstein Allergy as a receptionist in October 2016.  She signed an Employee Confidentiality Agreement on October 27, 2016 by which she agreed to hold confidential the patient, employee, and business information of Bernstein Allergy.  (Doc. 6-1; Hopper Dep., Doc. 24-1 at PageID 155–156.)

On the evening of June 19, 2017, Hopper went to the emergency room because she was experiencing chest pain.  (Doc. 32-2 at PageID 856.)  She was transferred to Bethesda North Hospital.  (Hopper Dep., Doc. 24-1 at PageID 198–204; Doc. 30-18 at PageID 794–811.)  Hopper testified at her deposition that Dr. Brooks Gerlinger at Bethesda North told her that she suffered from cardiac microvascular disease.  (Doc 24-1 at PageID 161.)  She stated that he explained the condition involved small blood vessels in the heart constricting due to stress, anxiety, or another stimulus.  (*Id.* at PageID 162.)  She stated that it caused her to have chest pain and sweating.  (*Id.* at PageID 163.)  She stated that Dr. Gerlinger's only advice to her was to lessen her stress and avoid caffeine.  (*Id.*)  After her hospitalization, she did not see Dr. Gerlinger or any other doctor to treat or manage cardiac microvascular disease.  (*Id.* at PageID 179–184.)  The medical records submitted as evidence do not indicate that she was diagnosed with cardiac microvascular disease.[2]  Hopper did not tell anyone at Bernstein Allergy that she suffered from cardiac microvascular disease.  (*Id.* at PageID 220–221.)

---

[1]  The underlying facts are derived in part from the parties' proposed undisputed facts and responses to those proposed facts.  (Docs. 24-2, 31-1, 33-1, 37-1.)

[2] Hopper testified at her deposition that Dr. Gerlinger diagnosed her with cardiac microvascular disease, but her attorney refers to it in the briefs as coronary microvascular disease.

The medical records from Bethesda North include the following notation from June 20, 2017:

> Stress Test:  Interpretation Summary:
> * * *
> 2.  Positive ECG for ischemia with pharmacologic stress.

(Doc. 32-2 at PageID 882.)  Hopper was given numerous medications in the hospital, including lisinopril.  (*Id.* at 881.)  The medical records do not explain for what reason any of the medications were administered.  (*Id.*)

Hopper informed her Bernstein Allergy co-worker and supervisors that she was hospitalized via text messages.  She told her co-worker Tammy Wade when she first had been admitted to the emergency room.  Hopper told Barb Mirlisena, the business administrator for Bernstein Allergy, that she had been admitted for chest pain and that the results of her nuclear stress test were abnormal.  (Doc. 30-18 at PageID 798.)  She stated that the cardiologist and cardiac surgeon told her that she would not be authorized to return to work until the following Monday, June 26, 2017.  (Doc. 30-4 at PageID 702–703.)  She stated she would provide a release to work note or narrative from the doctors, and she could provide other "medical documentation."  (*Id.*)  Later, Hopper informed Lisa Bernstein, the office manager, that she had gone to the emergency room for "worsening chest pain and pressure."  (*Id.* at PageID 794.)  Hopper also told her that "Dr. Mashy said that [my nuclear stress test] was abnormal and there [was] some part of my heart not getting enough blood."  (*Id.* at PageID 795.)[3]  Finally, Hopper told her that she was going to have an angiogram procedure and a possible stent placement.  (*Id.* at PageID 796.)

---

[3]  Hopper's medical records include notes from a consultation by John M. Mashny, MD at Bethesda North.  (Doc. 32-2 at PageID 882.)

Dr. Sydney Saxena, a hospitalist at Bethesda North, discharged Hopper on Thursday, June 22, 2017.  In the discharge summary, Dr. Saxena stated that Hopper was "discharged in good condition to pursue further workup of noncardiac chest pain with her primary care physician."  (Doc. 32-2 at PageID 866.)  Dr. Saxena provided her with a medical excuse from work until Monday June 26, 2017, but then released her to work without restriction:

> Ms. Hopper was hospitalized from 6/19–6/22 2017.  She will require medical leave of absence until Monday 6/26/2017.  She may return to work without restriction at that time.

 (Hopper Dep., Doc. 24-1 at PageID 171; Doc. 22-2 at PageID 91.)

Hopper returned to work on Monday, June 26, 2017.  Lisa Bernstein and Mirlisena terminated her employment with Bernstein Allergy on June 27, 2017.  (Hopper Dep., Doc. 24-1 at PageID 210.)  Lisa Bernstein gave Hopper a written termination letter.  She faulted Hopper for an inability to multi-task, but also stated that her attendance was "inadequate" and that her "many absences [were] unacceptable."  (Mirlisena Dep., Doc. 28 at PageID 418; Doc. 28-6 at PageID 529.)  At her deposition, Lisa Bernstein denied that the absences comment referred to Hopper's absence due to her hospitalization the prior week.  (Doc. 29 at PageID 633–636.)  Instead, she asserted that her comment referred to Hopper's previous absences, which had occurred on dates she could not specify and which she had approved in advance.  (*Id.*)

Mirlisena made written notes regarding the Hopper's work performance and attached them to a copy of the termination letter.  (Doc. 28-6 at PageID 530–531.)  She also faulted Hopper for "continued excess absenteeism" and for being "Absent & not notify management[.]" (*Id.* at PageID 531.)  Mirlisena testified at her deposition that she did not think that Hopper properly notified Bernstein Allergy management when she was hospitalized.  (Doc. 28 at PageID 426–427.)

Hopper did not apply for short-term disability benefits or long-term disability benefits during her employment with Bernstein Allergy.  Hopper was questioned at her deposition about whether she had requested a leave of absence:

> Q.  Isn't it true there is no request by you to Bernstein Allergy Group at any time in any shape or form requesting a leave of absence, isn't that true?
>
> MR. TREADAWAY:  Objection. You can answer.
>
> THE WITNESS:  A further leave of absence after the hospital, no.
>
> BY MR. THOMAS:
>
> Q.  My question is simple.  Please don't change my question.  My question is, isn't it true that you never made a request for leave of absence to Bernstein Allergy Group at any time in any form?
>
> MR. TREADAWAY:  Objection.  You can answer.
>
> THE WITNESS:  Correct.

(Doc. 24-1 at PageID 220.)

Hopper denied at her deposition that she had been counseled by Lisa Bernstein or Tammy Wade before she was terminated about performance deficiencies.  She specifically denied being counseled about failing to multitask, failing to follow the correct procedure for taking payment by credit card, failing to keep staff informed about patient arrivals, spending too much time on personal calls, using the work computer for personal matters, failing to properly scan and save records, having a hostile relationship with other employees, and eating at the front desk.  (*Id.* at 246–250, 254.)

.    **2.    Reports of Misconduct Made after Hopper's Termination**

       **a.    Complaint about Dr. Jon Bernstein to the Ohio State Medical Board**

In the afternoon on the day she was terminated, Hopper filed a complaint about Dr. Jon Bernstein with the Ohio State Medical Board.  (*Id.* at PageID 212.)  She reported that there were

"questionable medical practices" taking place at Bernstein Allergy, including specifically that Dr. Jon Bernstein supported an airline refund request by falsely stating that a child he had examined was too sick to fly.  (*Id.* at PageID 212–213.)  However, she admitted to the Medical Board that she had no written proof to support her allegation.  She stated that she only had overheard such information.  (*Id.* at PageID 214.)

     **b.**     **HIPAA Violation**

During the same afternoon, Hopper also reported to the U.S. Department of Health and Human Services ("DHHS") that Bernstein Allergy had violated HIPAA several months earlier at its Cornell Crossing office.  (*Id.* at PageID 210–211; Doc. 30-15 at PageID 749–751.)  Bernstein Allergy did not dispute that a HIPAA violation had occurred, but it disagreed as to who or what was responsible for the violation.  At 5:21 p.m. on January 30, 2017, an email was sent from Bernstein Allergy to a patient's mother using the office's multifunction (copy/fax/scan/email) printer.  The email contained a HIPAA release form requested by the mother, plus twenty pages of assorted medical records from several other Bernstein Allergy patients.  (Hopper Dep., Doc. 24-1 at PageID 232–235; Mirlisena Aff., Doc. 35-1 at PageID 1078.)  The patient's mother notified Bernstein Allergy about the wrongful disclosure, and on February 8, 2017 she emailed the documents back to the medical office to create a record of what had been sent to her.

The "shot record"—a record of injections administered at the Bernstein Allergy office—for Hopper's daughter, Aubrey, was among the wrongly disclosed medical records.  (Hopper Dep., Doc. 24-1 at PageID 233; Mirlisena Aff., Doc. 35-1 at PageID 1078.)  Aubrey Hopper's shot record was kept in a three-ring binder in the office's injection room along with the shot records of other patients.  (Mirlisena Aff., Doc. 35-1 at PageID 1078–1079.)  Aubrey Hopper's

shot record was returned to the binder after a copy was emailed to the other patient's mother. (*Id.*)

Alyssa Bick, a registered nurse, had worked on the day the HIPAA violation occurred. She testified that she was requested to and did email the HIPAA release form to the patient's mother.  (Bick Dep., Doc. 27 at PageID 259, 292.)  Bick denied that she emailed other patients records to the patient's mother.  (*Id*. at PageID 292–293, 295–296.)  Hopper also had worked on January 30, 2017, but she clocked out at 5:05 p.m. shortly before the email with the wrongful disclosures was sent.  (Mirlisena Aff., Doc. 35-1 at PageID 1075.)  An employee could remain in the building after clocking out.  (*Id.*)

Bick reported the wrongful disclosure to Lisa Bernstein, the office manager.  (Bick Dep., Doc. 27 at PageID 296.)  Lisa Bernstein told Bick that she would look into the disclosure.  (*Id.*) Bernstein Allergy did not report the disclosure to any regulatory or governmental agency at that time.  Bernstein Allergy did not discipline Bick because she denied making the wrongful disclosure.  Mirlisena, the business administrator, stated that Bernstein Allergy never had a similar wrongful disclosure of patient medical records before or after the incident on January 30, 2017.  (Doc. 35-1 at PageID 1079.)

After Hopper was fired on June 27, 2017, the wrongful disclosure incident was discussed again at Bernstein Allergy.  Jena Richter, a Bernstein Allergy nurse, alleged in a written statement dated June 29, 2017 that the following incident occurred right after the patient's mother had emailed the wrongly disclosed medical records back to Bernstein Allergy:  "Cindi [Hopper] printed off the email with the patient documents that were sent and stated 'this was her proof.'"  (Doc. 28-7 at PageID 536.)  Based on Richter's written statement, Mirlisena contacted Bernstein Allergy's malpractice carrier, DHHS, and the local police department to report her

belief that Hopper had taken copies of the wrongly disclosed patient records from the Bernstein Allergy office in violation of HIPAA. (Mirlisena Dep., Doc. 28 at PageID 452–458; Doc. 28-14.)

Janie M. Ratliff Sweeney of the law firm of Hemmer DeFrank Wessels PLLC represented Bernstein Allergy in the subsequent DHHS investigation. Ratliff Sweeney informed DHHS on November 22, 2017 that Bernstein Allergy was unable to determine whether the wrongful disclosure was made as a result of a software error or human error. (Doc. 28-12 at PageID 595.) Nonetheless, one month earlier, on October 25, 2017, Bernstein Allergy sent a letter to the families of patients whose medical records had been wrongly disclosed stating that it had a "reasonable belief" that "an employee whose employment had been terminated" on June 27, 2017 had stolen patient information on the day of her termination. (Doc. 28-14 at PageID 611.) This letter allegation is inconsistent with the earlier reports Mirlisena had made to DHHS and the police department that Hopper had taken copies of the disclosed records back in February 2017. Lisa Bernstein agreed at her deposition that Hopper could not have taken patient records from the medical office on the day of her termination in June 2017. (Doc. 29 at PageID 650.)

For her part, Hopper denied that that she took copies of the improperly disclosed documents, and she denied that she told Richter that she had proof. (Hopper Dep., Doc. 24-1 at PageID 240.) She also denied that she provided DHHS with copies of the wrongly disclosed medical records. (*Id.* at PageID 240, 260.)

**B.    Procedural History**

Hopper filed a Charge of Discrimination with the EEOC on or about August 31, 2017 asserting disability discrimination and retaliation. (Doc. 30-14 at PageID 747.) She alleged as

follows in the EEOC Charge:

> 1.  I began working for Bernstein Allery [*sic*] Group in October 2016 as a front office assistant.
>
> 2.  During my employment, I received regular praise for my work, and in February 2017, I was promised a raise.  I never received any discipline.
>
> 3.  I was hospitalized for a disability in the evening on Monday, June 19, 2017.  I notified Bernstein about my hospitalization in accordance with policy, and that I would need to be off of work the following day.
>
> 4.  I kept Bernstein Allergy Group apprised of my hospitalization and my work status.  I was ultimately released from the hospital on Friday, June 23, 2017.  My physician cleared me to return to work the following Monday.
>
> 5.  During my absence, Bernstein Allergy Group expressed displeasure with my absence.
>
> 6.  I returned to work on Monday, June 26, 2017.
>
> 7.  On Tuesday, June 27, 2017, I was called into a meeting when I arrived at work.  The [*sic*] Barb Mirlisena and Lisa Bernstein informed me that I was being terminated for allegedly not being able to multitask.  I had never before been notified that I was unable to multitask.
>
> 8.  Bernstein Allergy Group's justification for terminating me is pretext for illegal discrimination on the basis of my disability and retaliation for requesting a leave of absence as an accommodation.
>
> 9.  As a result of Bernstein Allergy Group's illegal actions, I have suffered damages, including lost wages and emotional distress.

(*Id.* at PageID 748.)

Bernstein Allergy filed a response with the EEOC dated October 13, 2017.  (Doc. 28-5.) It denied knowing that Hopper had a disability and denied that she had asked for an accommodation as a part of its defense.  (*Id.* at PageID 526–527.)  The EEOC issued Hopper a Notice of Right to Sue on June 27, 2018.  (Doc. 22-4 at PageID 94.)

Hopper initiated this court action by filing the Complaint against Bernstein Allergy on September 20, 2018.  (Doc. 1.)  She asserted three claims for violations of the Americans with Disabilities Act Amendments Act ("ADA"), 42 U.S.C. § 12101, and Ohio Revised Code

§ 4112.02: (1) a failure to accommodate; (2) disability discrimination (wrongful termination); and (3) retaliation. (*Id.* at PageID 4–5.)

Bernstein Allergy responded by filing an Answer and Counterclaim on November 12, 2018. (Doc. 6.) Bernstein Allergy denied liability as to the claims asserted against it. Bernstein Allergy also asserted four counterclaims against Hopper based on allegations that Hopper misappropriated and disclosed confidential medical records: (1) breach of the Employee Confidentiality Agreement; (2) conversion; (3) intentional spoliation of evidence; and (4) tortious interference with business relations. (*Id.* at PageID 22–23.) Hopper filed an Answer denying liability on the counterclaims on December 3, 2018. (Doc. 11.) On December 16, 2019, Bernstein Allergy voluntarily dismissed its spoliation of evidence counterclaim. (Doc. 21.)

Following discovery, the parties filed the pending cross-Motions for Summary Judgment. The motions are fully briefed and ripe for adjudication. The Court heard oral arguments on the motions on May 12, 2020.

## II.    STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden to show that no genuine issues of material fact are in dispute. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–887 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011). The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–324 (1986). In responding to a summary judgment motion, the nonmoving party may not

rest upon the pleadings but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

A court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. "[F]acts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added); *see also EEOC v. Ford Motor Co.*, 782 F.3d 753, 760 (6th Cir. 2015) (*en banc*) (quoting *Scott*). "A dispute is 'genuine' only if based on *evidence* upon which a reasonable jury could return a verdict in favor of the non-moving party." *Shreve v. Franklin Cnty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014) (emphasis in original) (citation omitted). "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. "Where the parties have filed cross-motions for summary judgment, the court must consider each motion separately on its merits, since each party, as a movant for summary judgment, bears the burden to establish both the nonexistence of genuine issues of material fact and that party's entitlement to judgment as a matter of law." *In re Morgeson,* 371 B.R. 798, 800–801 (B.A.P. 6th Cir. 2007)

## III.  ANALYSIS

### A.  Hopper's Claims Against Bernstein Allergy

The ADA provides that a covered employer "shall [not] discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Likewise, Ohio prohibits employment discrimination on the basis of disability. Ohio Rev. Code § 4112.02(A). Because

the statutes contain similar prohibitions, courts rely on interpretations of the federal statute as

persuasive authority in interpreting Ohio's statute. *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d

195, 201 (6th Cir. 2010); *Columbus Civ. Serv. Comm. v. McGlone*, 82 Ohio St. 3d 569, 697

N.E.2d 204, 206–07 (1998).

Hopper asserted claims for failure to accommodate, disability discrimination, and

retaliation. The Court will address the first two claims together because they fail for the same

reason.[4]

### 1. Failure to Accommodate and Disability Discrimination

The ADA's prohibition against discrimination includes "not making reasonable

accommodations to the known physical or mental limitations of an otherwise qualified individual

with a disability . . . unless such covered entity can demonstrate that the accommodation would

impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A). To

prevail on a failure-to-accommodate claim, Hopper would need to establish: (1) she was disabled

within the meaning of the ADA; (2) she was otherwise qualified for the position; (3) Bernstein

Allergy knew or had reason to know of the disability; (4) she requested an accommodation; and

(5) Bernstein Allergy failed to provide the reasonable accommodation. *Green v. BakeMark USA,

LLC*, 683 F. App'x 486, 491 (6th Cir. 2017). "[I]f the employee never requests an

accommodation, the employer's duty to engage in the interactive process is never triggered."

*Melange v. City of Center Line*, 482 F. App'x 81, 85 (6th Cir. 2012).

Likewise, to prove she was wrongfully terminated on the basis of her disability, Hopper

would need to prove that (1) she was disabled; (2) she was otherwise qualified for her position,

---

[4] Bernstein Allergy also moved for summary judgment on the failure to accommodate claim only on the basis that
Hopper did not exhaust her administrative remedies. Bernstein Allergy argued that Hopper did not raise a failure to
accommodate claim in her EEOC Charge. The Court disagrees. Hopper asserted that she requested "a leave of
absence as an accommodation" in the EEOC Charge. (Doc. 30-14 at PageID 748.) The Court will not grant
summary judgment on the failure to accommodate claim to Bernstein Allergy on this basis.

with or without reasonable accommodation; (3) she was terminated; (4) Bernstein Allergy knew

or had reason to know of her disability; and (5) Bernstein Allergy replaced or sought to replace

her. *Barlia v. MWI Veterinary Supply, Inc.*, 721 F. App'x 439, 444 (6th Cir. 2018); *Ferrari v.

Ford Motor Co.*, 826 F.3d 885, 894 (6th Cir. 2016). The burden-shifting scheme of *McDonnell

Douglas* applies to disability discrimination claims. *See Barlia*, 721 F. App'x at 444; *Whitfield

v. Tenn.*, 639 F.3d 253, 259 (6th Cir. 2011).

Bernstein Allergy argued that Hopper cannot prove disability discrimination based on a

failure to accommodate or wrongful termination because she lacks sufficient evidence for a

reasonable jury to conclude that she suffered a disability. The Sixth Circuit has explained how to

determine whether a person has a disability:

> To qualify as disabled under the ADA, an individual must: (1) be actually
> disabled, i.e., suffer from "a physical or mental impairment that substantially
> limits one or more major life activities," (2) have "a record of such an
> impairment," or (3) be "regarded as having such an impairment." 42 U.S.C. §
> 12102(1). "Major life activities" include, but are not limited to, performing
> manual tasks, walking, standing, concentrating, thinking, and working, as well as
> the operation of major bodily functions, such as endocrine[, respiratory, and
> circulatory] functions. 42 U.S.C. § 12102(2). . . .
>
> The ADA also includes a number of rules of construction. Having concluded that
> the courts were defining "disability" too narrowly, Congress amended the ADA in
> 2008 to state that the term should be construed "in favor of broad coverage ..., to
> the maximum extent permitted by the [ADA's] terms." 42 U.S.C. § 12102(4)(A);
> ADA Amendments Act ("ADA"), Pub. L. No. 110-325, § 2, 122 Stat. 3553
> (2008). Moreover, Congress explicitly rejected a number of standards formulated
> by the Supreme Court, such as the requirement that the impairment be "permanent
> or long-term" to qualify as a disability under the ADA. 42 U.S.C. §
> 12102(4)(D) ("An impairment that is episodic or in remission is a disability if it
> would substantially limit a major life activity when active."); ADA § 2(b)(4)
> (stating that a purpose of ADA is to "reject ... standards enunciated by the
> Supreme Court in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534
> U.S. 184, 122 S.Ct. 681, 151 L.Ed.2d 615 (2002)," which included the
> requirement that an impairment's impact be "permanent or long-term" to qualify
> as a "substantial limitation"). Congress also cautioned that "the question of
> whether an individual's impairment is a disability ... should not demand extensive
> analysis." ADA § 2(b)(5).

*Barlia*, 721 F. App'x at 445.  As explained below, the Court agrees that Hopper has not established that she suffered a disability even bearing in mind that disabilities are not to be construed narrowly.

Hopper did not specifically identify the nature of her disability or what major life activities are impaired in her Complaint.  She alleged only that she was "hospitalized with chest pain" on June 19, 2017, "diagnosed with Coronary Microvascular Disease[,]" and "cleared to return to work on Monday, June 26, 2017[.]"  (Doc. 1 at PageID 3.)  Later, Hopper stated as follows in the summary judgment briefing as her evidence that she had a disability:

> Ms. Hopper clearly suffered from a condition that affected her circulatory system and/or circulatory function.  Ms. Hopper's condition caused strong chest pain, pressure, and aching, as well as sweating. (Hopper Dep., Doc. 24-1, PageID# 163; Doc. 32-2, PageID# 856).  Her test results reflected high blood pressure and a positive test for cardiac ischemia, which is a restriction of blood flow to the heart. (Doc. 32-2, PageID# 882).  And Ms. Hopper testified that a cardiologist at Bethesda North verbally diagnosed her with coronary microvascular disease, which causes the small blood vessels in the heart to constrict and can lead to angina.  (Hopper Dep., Doc. 24-1, PageID# 161).  Considered as a whole, Ms. Hopper clearly suffered from a disability under the ADA.  *See, e.g. Baum v. Metro Restoration Services, Inc.,* No. 3:15-cv-00787, 2017 WL 2221704, at *3 (W.D. Ky. May 19, 2017) (district court denied summary judgment on claim that heart condition substantially limited employee's circulatory and cardiovascular systems); *see also Latch v. Se. Penn. Transp. Auth.,* 984 F.Supp. 317 (E.D. Penn. 1997) (genuine issue of material fact exists as to whether ischemia is a disability under the ADA).
>
> Whether Ms. Hopper's medical records reflect a formal name for her condition is immaterial to a determination that she suffered from a disability.  In *Clark v. Whirpool Corp.,* the Sixth Circuit held that an employee's testimony regarding her disability and its effect on her, despite providing no medical records to support her claims, was enough to establish that she suffered from a disability. 109 Fed. Appx. 750, 754 (6th Cir. 2004).  Here, Ms. Hopper has testified that she was diagnosed with cardiac microvascular disease.  And she also testified as to the effect it had on her.  Accordingly, Ms. Hopper's testimony establishes her disability.
>
> * * * Here, Ms. Hopper has shown that her microvascular cardiac disease substantially limits her circulatory system and/or circulatory function. The fact that she came back without restrictions—due to her prescription for Lisinopril— is immaterial to the determination of whether she is disabled.

(Doc. 33 at PageID 1051–1052.)

The admissible evidence does not support her contentions. First, Hopper offered only hearsay evidence that she suffered from cardiac microvascular disease. She testified that Dr. Gerlinger orally diagnosed her with cardiac microvascular disease, but that that hearsay evidence is not admissible under any exception. Fed. R. Evid. 801(c), 802, 803.[5] She did not support her hearsay testimony with an affidavit, sworn declaration, or deposition of Dr. Gerlinger, or a written diagnosis in the medical records. Further, Hopper testified that she has not sought treatment for the cardiac microvascular disease with Dr. Gerlinger or any other physician since she left the hospital. A plaintiff's "bare assertions of [a heart disorder], without any supporting medical evidence" are not sufficient to establish a disorder within the meaning of the ADA. *Neely v. Benchmark Family Servs.*, 640 F. App'x 429, 433 (6th Cir. 2016) (stating that a plaintiff's bare assertions of sleep apnea were not sufficient). The Court holds that Hopper has failed to establish a disputed issue of fact whether she suffered from cardiac microvascular disease.

Hopper also suggested that the notation in her hospital record from June 20, 2017 that she was administered lisinopril is evidence that she had a heart condition.[6] However, Hopper offered no competent expert medical testimony that lisinopril is used to treat heart conditions. The medical record to which Hopper cited does not explain for what reason the lisinopril or other

---

[5] The exception in Federal Rule of Evidence 803(4), "Statement Made for Medical Treatment or Diagnosis[,]" does not apply. The Sixth Circuit has held that "the hearsay exception set forth in Fed.R.Evid. 803(4) applies only to statements made by the one actually seeking or receiving medical treatment." *Field v. Trigg Cty. Hosp., Inc.*, 386 F.3d 729, 736 (6th Cir. 2004). For this reason, "[w]hile Plaintiff may testify as to the symptoms that she experienced, *see* Fed. R. Evid. 803(3), she may not testify as to the medical conditions with which she has allegedly been diagnosed, *see* Fed. R. Evid. 803(4)." *Merendo v. Ohio Gastroenterolgy Grp., Inc.*, No. 2:17-CV-817, 2019 WL 3254620, at *3 (S.D. Ohio July 19, 2019).

[6] To be clear, Hopper did not testify that she was administered lisinopril to treat a heart condition, but rather her attorney makes that argument in the brief.

medications she received were administered.  Moreover, although lisinopril was ordered by

Geeta Srivastava, MD on June 20, 2017, the medication was discontinued by Dr. Saxena one day

later on June 21, 2017.  (Doc. 32-2 at PageID 881, 919, 942.)  Accordingly, the Court rejects the

suggestion that the lisinopril notation is evidence sufficient to create a genuine disputed issue

that Hopper had a heart condition.

 At most, the medical records indicate that Hopper took a stress test on June 20, 2017 that

was "positive ECG for ischemia."  (*Id.* at PageID 882.)[7]  Hopper did not testify as to her

understanding of ischemia nor provide any competent medical testimony explaining it.  Her

attorney's argument that it refers to a restriction of blood flow to the heart is not admissible

evidence, but the Court acknowledges that this explanation is consistent with the Merriam-

Webster's online medical dictionary.[8]  Nonetheless, the notations to ischemia in the record do

not explain the severity or duration of Hopper's ischemic condition, nor whether it was expected

to recur.  *See, e.g.*, *Lovreta v. Delta Glob. Servs.*, No. 2:19-cv-02469, 2019 WL 8016714, at *5

(W.D. Tenn. Nov. 5, 2019) (stating that "non-severe impairments that last only a short period of

time are not necessarily covered by the ADA"), *report and recommendation adopted,* 2020 WL

91503 (W.D. Tenn. Jan. 8, 2020); *Senanayake v. Del. Cty. Bd. of Comm'rs*, No. 2:15-CV-65,

2017 WL 2688065, at *18 (S.D. Ohio June 22, 2017) (stating that severity and duration are

relevant considerations, and finding that a knee contusion that did not involve a tear of the

---

[7]  Hopper cites this same document for the purported fact that she had high blood pressure.  (Doc. 33 at PageID 1051 citing Doc. 32-2 at PageID 882.)  The Court does not read that page of the medical records to discuss Hopper's blood pressure at all.  On the prior page, which also was from June 20, 2017, there is a notation of "BP 145/90 | Pulse 61[.]"  (Doc 32-2 at PageID 881.)  However, even assuming the Court could infer that was a high blood pressure, the medical records from June 23, 2017 has different numbers of "BP 121/72 | Pulse 64[.]"  (*Id.* at PageID 889.)  The evidence appears to show that her blood pressure fluctuated.  The Court cannot infer from a single medical record notation to a blood pressure reading—unsupported by either expert medical testimony or detailed testimony by the plaintiff as to her subjective feelings of impairment—that Hopper had an impairment that substantially limited a major life activity or major bodily function.

[8]  Ischemia is defined as "deficient supply of blood to a body part (as the heart or brain) that is due to obstruction of the inflow of arterial blood (as by the narrowing of arteries by spasm or disease)."  https://www.merriam-webster.com/dictionary/ischemia#medicalDictionary.

meniscus and which appeared to heal in three weeks was not a disability). In fact, Dr. Saxena wrote in the discharge summary that Hopper was discharged in good condition.

Even if the Court were to accept that Hopper was ischemic during her hospitalization, she has not offered sufficient evidence to create a genuine disputed fact whether the condition substantially limited a major life activity or a bodily function. She testified that she suffered chest pain and pressure when she was admitted to the hospital, and that some part of her heart was not getting enough blood. However, she did not testify that those problems continued after the angiogram or during the duration of her stay in the hospital. Hopper was discharged from the hospital after less than four days on June 22, and she returned to work on June 26. Hopper did not testify that she suffered from chest pain or pressure when she was discharged or when she returned to work. She did not testify that she expected the chest pain or pressure to be recurring. In fact, Dr. Saxena specifically authorized her to return to work without restriction. The lack of evidence distinguishes this case from the cases upon which Hopper relies. *See Clark v. Whirlpool Corp.*, 109 F. App'x 750, 754 (6th Cir. 2004) (holding that corroborating medical testimony was not necessary to prove that an impairment substantially limited a major life activity when the plaintiff testified that "she was in constant pain due to the injuries to her neck, back, hips, feet and left knee; she had headaches that required her to take sixteen Ibuprofen each day; she took narcotic pain medication to control her discomfort; she could not control her bowels or bladder; and she had to take medication to help her sleep"); *Latch v. SE Penn. Trans. Auth.*, 984 F. Supp. 317, 320–321 (E.D. Penn. 1997) (denying summary judgment where the parties presented "conflicting medical opinions of plaintiff's cardiologist and defendant's medical director[,]" as well as other medical evidence concerning the plaintiff's heart attack and continuing evidence of ischemia).

In sum, Hopper has not met her burden to put forward sufficient evidence for a reasonable jury to conclude that she suffered from a heart condition that substantially impaired a major life activity or a major bodily function. Bernstein Allergy is entitled to summary judgment on the failure to accommodate and the disability discrimination claims.

### 2. Retaliation

Hopper also asserted that she was subjected to retaliation in violation of the ADA when Bernstein Allergy terminated her because she had requested an accommodation for her purported disability in the form of a medical leave during her hospitalization. To establish a claim for retaliation under the ADA, a plaintiff must demonstrate that: "(1) she engaged in protected activity; (2) the exercise of her civil rights was known by the defendant; (3) the defendant thereafter took adverse employment action; and (4) a causal connection exists between the protected activity and the adverse employment action." *Hibbler v. Reg'l Med. Ctr. at Memphis*, 12 F. App'x 336, 340 (6th Cir. 2001).

Before addressing the elements set forth in *Hibbler*, the Court points out that the ADA retaliation claim is not foreclosed by the fact that Hopper could not establish she had a disability. There is evidence that Hopper suffered from chest pain and that she was admitted to the hospital for several days for evaluation and treatment. She requested time off work during her hospitalization. "[T]o establish a retaliation claim the plaintiff need not prove he had a disability under the ADA. Rather, the protected act is the showing of a good-faith request for reasonable accommodations." *Baker v. Windsor Republic Doors*, 414 F. App'x 764, 777 n.8 (6th Cir. 2011); *see also Neely*, 640 F. App'x 437 (stating that "a plaintiff may prevail on a disability-retaliation claim even if the underlying claim of disability fails.") (quoting *Bryson v. Regis Corp.*, 498 F.3d 561, 577 (6th Cir. 2007)).

Whether Hopper engaged in protected activity by requesting an accommodation for purposes of the ADA is the key issue for this claim. Hopper argued that the leave of absence from work that she requested during her hospitalization in June 2017 constituted a request for reasonable accommodation. A "medical leave can constitute a reasonable accommodation under the ADA." *Cook v. Fed. Reserve Bank of Cleveland*, No. 1:18CV83, 2019 WL 2502707, at *8 (S.D. Ohio June 17, 2019) (citing *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 394 (6th Cir. 2017)). Bernstein Allergy responded out that Hopper never stated that she had a disability, never stated that she needed an accommodation under the ADA, and never applied for a short- or long-term disability leave of absence. However, "an employee need not use the magic words 'accommodation' or even 'disability,'" so long as the it is clear from the context that the request "is being made in order to conform with existing medical restrictions." *Leeds v. Potter*, 249 F. App'x 442, 449 (6th Cir. 2007); *see also Kovac v. Superior Dairy, Inc.*, 998 F. Supp. 2d 609, 619 (S.D. Ohio 2014) (citing *Leeds*).

Here, Hopper told Lisa Bernstein and Mirlisena from the hospital that she was unable to return to work that week because she had been admitted to the hospital for chest pain, that her stress test result was abnormal, and that she was going to undergo an angiogram and maybe a stent placement. She told Lisa Bernstein that her heart was not getting enough blood. She told Mirlisena that the doctors would provide her with a release to return to work narrative, and that she could provide additional medical documentation. This is sufficient evidence for a reasonable jury to conclude that her request for time off constituted a good-faith request for a reasonable accommodation for her then-existing medical condition.

Hopper also produced evidence on the other factors of a retaliation prima facie case. Bernstein Allergy knew Hopper requested a short leave of absence while she was hospitalized. It

is undisputed that Mirlisena and Lisa Bernstein terminated Hopper's employment one day after she was cleared to return to work on June 27, 2017.  Finally, both supervisors stated their dissatisfaction with Hopper's absences in writing.  This evidence is sufficient to meet Hopper's prima facie burden on the disability retaliation claim.

Bernstein Allergy moved for summary judgment only on the basis that Hopper could not meet her prima facie burden for the disability claims.  It did not assert a legitimate, non-discriminatory reason for the termination decision in its briefs.  As such, the Court need not proceed with the remaining *McDonnell Douglas* analysis.  The Court will deny summary judgment to Bernstein Allergy on the disability retaliation claim.

**B.      Bernstein Allergy's Counterclaims Against Hopper**

**1.      Merits of the Claims**

Bernstein Allergy has three remaining claims against Hopper based on allegations that Hopper wrongfully disclosed confidential medical records and then took copies of those records: (1) breach of the Employee Confidentiality Agreement; (2) conversion; and (3) tortious interference with business relations.  Hopper moved for summary judgment on each claim arguing that Bernstein Allergy lacks proof that she either wrongfully disclosed patient records to a patient's mother via email on January 30, 2017 or that she later took copies of those same records from the medical office.  The Court agrees with Hopper that these claims fail for lack of proof.

Bernstein Allergy contended that the following circumstantial evidence supports its claims:  (1) Hopper had access to the medical records and the multifunction printer in her position at the medical office; (2) her work location was in the front of the office close to the multifunction machine, the medical records, and the shot records; (3) Hopper worked on January

30, 2017, the day the records were disclosed; (4) although Hopper had clocked out of work before the wrongful disclosure by email occurred, she was not required to leave the medical office immediately after clocking out; (5) the disclosed medical records included the shot record of Hopper's daughter; (6) the shot record for Hopper's daughter was returned to the shot record binder; (7) Alyssa Bick, the nurse who emailed the HIPAA release form to the patient's mother on January 30, denied disclosing other medical records in the email; and (8) Jena Richter, a nurse, asserted in a written statement that Hopper printed off the email containing copies of the wrongly disclosed medical records and stated that she had proof.

This circumstantial evidence, however, is partially inadmissible and wholly too speculative to withstand summary judgment. First, the Richter written statement is inadmissible hearsay and cannot be considered for the truth of the matter asserted. Next, a reasonable factfinder cannot draw a negative inference from the fact that Hopper worked on the day of the incident. Hopper had clocked out before the wrongful disclosure email was sent, and Bernstein Allergy offered no affirmative evidence that she remained in the office after clocking out. The fact that Hopper had access to the records and multifunction printer is not probative of culpability because Bick also had access to those items. Both Hopper and Bick denied making the wrongful disclosure, but only Bick admitted to emailing the patient's mother on the day of the disclosure. Moreover, Bernstein Allergy, through its attorney, told DHHS that it could not determine whether the disclosure was made by human error or a technology malfunction. Finally, the fact that the wrongful disclosure included the shot record for Hopper's daughter, while curious, does not alone or in conjunction with the other circumstantial evidence provide a sufficient basis for a reasonable jury to conclude that Hopper wrongfully disclosed the patient medical records.

Additionally, the allegation that Hopper took copies of the disclosed medical records appears to be based only on the inadmissible Richter written statement that Hopper stated vaguely that she now had proof. Bernstein Allergy did not offer admissible testimony from anyone who saw Hopper take the wrongly disclosed medical records from the medical office nor from anyone who saw the records in her possession outside of the office.

The Court will grant summary judgment to Hopper on the counterclaims against her.

### 2. Hopper's Request for Sanctions

Finally, Hopper moves for attorney fees pursuant to 28 U.S.C. § 1927 on the basis that the counterclaims against her are frivolous. The statute provides:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927. Pursuant to § 1927, "when an attorney knows or reasonably should know that a claim pursued is frivolous, or that his or her litigation tactics will needlessly obstruct the litigation of nonfrivolous claims, a trial court does not err by assessing fees attributable to such actions against the attorney." *Jones v. Cont'l Corp.*, 789 F.2d 1225, 1230 (6th Cir. 1986). This is an objective standard. *See id; Ridder v. City of Springfield*, 109 F.3d 288, 298 (6th Cir. 1997).

Hopper complained that Bernstein Allergy filed its counterclaims on November 12, 2018, approximately a year after its legal counsel admitted to DHHS that it could not determine whether the wrongful disclosure was caused by a computer malfunction or human error. Bernstein Allergy responded that it reached the conclusion that Hopper made the wrongful disclosure after a second investigation by a different attorney of the same law firm, Scott Thomas. (Thomas Aff., Doc. 35-2 at PageID 1081–1082.) The attorney concluded that the

circumstantial evidence set forth above was a reasonable basis to conclude that Hopper made the wrongful disclosure.

Both parties in this case filed claims and proceeded to this summary judgment stage on claims for which they lacked sufficient admissible supporting evidence. The Court will not impose sanctions in this case.

## IV.    CONCLUSION

For the foregoing reasons, Defendant/Counterclaimant Bernstein Allergy Group, Inc.'s Motion for Summary Judgment (Doc. 22) is **GRANTED IN PART AND DENIED IN PART** and Plaintiff/Counterclaim Defendant Cynthia Hopper's Motion for Summary Judgment (Doc. 31) is **GRANTED IN PART AND DENIED IN PART**. Bernstein Allergy is granted summary judgment on the disability failure to accommodate and wrongful termination discrimination claims against it, but not on the disability retaliation claim. Hopper is granted summary judgment on the counterclaims against her, but her request for sanctions is denied.

This case will proceed to trial only on Hopper's disability retaliation claim against Bernstein Allergy. The Court will issue a scheduling order for the final pretrial conference and trial at a later date. The Court urges the parties to confer at their earliest convenience as to whether a settlement can be reached in lieu of proceeding to trial.

**IT IS SO ORDERED.**

Dated this 18th day of May, 2020.

BY THE COURT:


S/Susan J. Dlott
Susan J. Dlott
United States District Judge